1   Neil A. Goteiner (State Bar No. 083524)
        ngoteiner@fbm.com
2   Farella Braun & Martel LLP
    235 Montgomery Street, 17th Floor
3   San Francisco, CA  94104
    Telephone:  (415) 954-4400
4   Facsimile:   (415) 954-4480

5   Attorneys for Plaintiffs
    MONEX DEPOSIT COMPANY and
6   MONEX CREDIT COMPANY

7

8                   UNITED STATES DISTRICT COURT

9                         CENTRAL DISTRICT

10            (SOUTHERN DIVISION – SANTA ANA)

11

12  MONEX DEPOSIT COMPANY and          Case No. 8:09-CV-00287-JVS-AN
    MONEX CREDIT COMPANY,
13                                      **MEMORANDUM IN SUPPORT
                    Plaintiffs,         OF APPLICATIONS FOR
14                                      TEMPORARY RESTRAINING
          vs.                           ORDER, FOR ORDER TO SHOW
15                                      CAUSE, AND FOR EARLY
    JASON GILLIAM, STEVEN               DISCOVERY**
16  BOWMAN, RICHARD GILLIAM,
    and DOES 1–50,                      The Hon. James V. Selna
17
                    Defendants.
18

19

20

21

22

23

24

25

26

27

28

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

MEM. ISO TRO
Case No. 8:09-CV-00287-JVS-AN

23587\1900827.3

1

**TABLE OF CONTENTS**

2

| | | **Page** |
|---|---|---|
| I. | INTRODUCTION AND SUMMARY OF ARGUMENT | 1 |
| II. | STATEMENT OF FACTS | 4 |
| | A. The Immediate Catalyst For this Application for a TRO | 4 |
| | B. Monex and the Defendants | 6 |
| | C. The Website's Role In the Extortionate Scheme | 7 |
| | D. Irreparable Injury Caused By Defendants' Website Scheme | 9 |
| | E. Additional Facts About Defendants' Extortion | 11 |
| III. | ARGUMENT | 16 |
| | A. Defendants' Conduct and Surrounding Facts Meet TRO Criteria for Enjoining Defendants' Website Pending the Preliminary Injunction Hearing. | 16 |
| | 1. Monex Is Suffering Irreparable Harm Because Damage to Its Reputation and Goodwill From Defendants' Extortion Cannot Be Calculated or Remedied | 16 |
| | 2. Monex Has a Reasonable Probability of Succeeding On the Merits Because Its Claims Are Viable And Rest On Solid Evidence. | 17 |
| | 3. The Balance of Equities Tips in Monex's Favor Because The Harm to Its Business Is Great and Defendants Will Suffer No Legally Cognizable Harm by a TRO | 21 |
| | B. The Court Should Allow Early Discovery To Gather Evidence For A Preliminary Injunction Hearing. | 25 |
| IV. | CONCLUSION | 25 |

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

23587\1900827.3

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*Caribbean Marine Srvcs. Co., Inc. v. Baldrige*,
844 F.2d 668 (9th Cir. 1988)................................................17

*Carroll v. President & Comm'rs of Princess Anne*,
393 U.S. 175, 89 S. Ct. 347 (1968) ................................24

*Cassim v. Bowen*,
824 F.2d 791 (9th Cir. 1987)................................................17

*In re Countrywide Fin. Corp. Derivative Litig.*,
542 F. Supp. 2d 1160 (C.D. Cal. 2008)................................25

*Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*,
604 F.2d 200 (2d Cir. 1979) ................................24

*Doran v. Salem Inn, Inc.*,
422 U.S. 922 (1975) ................................................17

*Dr. Seuss Enters., L.P. v. Penguin Books U.S.A., Inc.*,
109 F.3d 1394 (9th Cir. 1997)................................24

*Flynt Distrib. Co. v. Harvey*,
734 F.2d 1389 (9th Cir. 1984)................................10

*FoodComm Int'l v. Barry*,
328 F.3d 300 (7th Cir. 2003) ................................16

*Freedman v. State of Md.*,
380 U.S. 51, 85 S. Ct. 734 (1965) ................................24

*Gompers v. Buck's Stove & Range Co.*,
221 U.S. 418, 31 S. Ct. 492 (1911) ................................22

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
481 F.3d 60 (2nd Cir. 2007) ................................17

*J.K. Harris & Co. v. Kassel*,
253 F. Supp. 2d 1120 (N.D. Cal. 2003)................................23

*Johnson v. Cal. State Bd. of Accountancy*,
72 F.3d 1427 (9th Cir. 1995)................................17

*Kinglsey Books, Inc. v. Brown*,
354 U.S. 436, 77 S. Ct. 1325 (1957) ................................22

*Madsen v. Women's Health Ctr., Inc.*,
512 U.S. 753, 114 S. Ct. 2516 (1994) ................................24

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

- ii -

23587\1900827.3

1

2

**TABLE OF AUTHORITIES**
(continued)

Page

3    *Martin v. Reynolds Metals Co.*,
          224 F. Supp. 978 (D. Or. 1963) ............................................. 23

4

5    *Midgett v. Tri-County Metro. Trans. Dist. of Or.*,
          254 F.3d 846 (9th Cir. 2001) .................................................. 17

6    *Near v. Minn.*,
          283 U.S. 697, 51 S. Ct. 625 (1931) ........................................ 22

7

8    *Paris Adult Theatre I v. Slaton*,
          413 U.S. 49, 93 S. Ct. 2628 (1973) ........................................ 22

9    *Pittsburgh Press Co. v. Human Rel. Comm'n*,
          413 U.S. 376, 93 S. Ct. 2553 (1973) ...................................... 22

10

11   *Qwest Comms. Int'l, Inc. v. WorldQuest Networks, Inc.*,
          213 F.R.D. 418 (D. Colo. 2003) ............................................. 25

12   *RD Legal Funding, LLC v. Erwin & Balingit, LLP*,
          Civil No. 08cv597-L(RBB), 2008 WL 3843511 (S.D. Cal. 2008) .............. 10

13

14   *Rent-A-Center, Inc. v. Canyon Television & Appliance*,
          944 F.2d 597 (9th Cir. 1991) .................................................. 17

15   *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
          102 F.3d 12 (1st Cir. 1996) ................................................... 16

16

17   *San Antonio Cmty. Hosp. v. S. Cal. Dist. Council of Carpenters*,
          125 F.3d 1230 (9th Cir. 1997) ............................................. 3, 23

18   *Schenck v. Pro-Choice Network of W. N.Y.*,
          519 U.S. 357, 117 S. Ct. 855 (1997) ...................................... 24

19

20   *Stanley v. Univ. of S. Cal.*,
          13 F.3d 1313 (9th Cir. 1994) .................................................. 25

21   *Sterling Trading, LLC v. United States*,
          553 F. Supp. 2d 1152, 1162 (C.D. Cal. 2008) .......................... 22

22

23   *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*,
          240 F.3d 832 (9th Cir. 2001) .................................................. 17

24   *United States v. Marine Shale Processors*,
          81 F.3d 1329 (5th Cir. 1996) .................................................. 21

25

26   *Vondran v. McLinn*,
          No. C 95-20296 RPA, 1995 WL 415153 (N.D. Cal. July 5, 1995) .............. 23

27   *Winter v. Natural Res. Def. Council, Inc.*,
          129 S. Ct. 365, 172 L. Ed. 2d 249 (2008) ............................. 16, 17

28

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

- iii -

23587\1900827.3

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page**

3

**STATE CASES**

4

*Aguilar v. Avis Rent A Car Sys., Inc.,*
 21 Cal. 4th 121, 87 Cal. Rptr. 2d 132 (1999)................................22

5

*Bingham v. Struve,*
 591 N.Y.S.2d 156 (N.Y. App. Div. 1992)........................................23

6

7

*Burnham Broad. Co. v. Williams,*
 629 So. 2d 1335 (La. Ct. App. 1993) ........................................22, 23

8

*Cochran v. Tory,*
 No. B159437, 2003 WL 22451378 (Cal. Ct. App. 2003) ..............23

9

10

*DVD Copy Control Ass'n, Inc. v. Bunner,*
 31 Cal. 4th 864, 4 Cal. Rptr. 3d 69 (2003)....................................24

11

*Family Planning Specialists Medical Grp., Inc. v. Powers,*
 39 Cal. App. 4th 1561, 46 Cal. Rptr. 2d 667 (1995)...............18, 22

12

13

*Farmers Ins. Exch. v. Zerin,*
 53 Cal. App. 4th 445, 61 Cal. Rptr. 2d 707 (1997)........................17

14

*Flatley v. Mauro,*
 39 Cal. 4th 299, 139 P.3d 2 (2006) .........................................18, 22

15

16

*Haigler v. Donnelly,*
 18 Cal. 2d 674, 117 P.2d 331 (1941).............................................19

17

*Leonardini v. Shell Oil Co.,*
 216 Cal. App. 3d 547, 264 Cal. Rptr. 883 (1989) .........................19

18

19

*Montgomery Ward & Co. v. United Retail, Wholesale & Dep't Store
 Employees of Am., CIO,*
 79 N.E.2d 46, 400 Ill. 38 (Ill. 1948)..............................................23

20

21

*People v. Choynski,*
 95 Cal. 640, 30 P. 791 (1892)........................................................17

22

*Rouse Phila. Inc. v. Ad Hoc '78,*
 417 A.2d 1248, 274 Pa. Super. 54 (Pa. Super. Ct. 1979)..............23

23

24

**FEDERAL STATUTES**

25

18 U.S.C.
 § 1961(1)..........................................................................................21
 § 2511 ..............................................................................................15

26

27

28

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

**STATE STATUTES**

4

Cal. Civ. Code
      §§ 45–46 ...................................................................................................19
5
      §§ 3426.1–3426.3 ....................................................................................20

6
Cal. Penal Code
      § 518 .........................................................................................................18
7
      § 631 .........................................................................................................15

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

23587\1900827.3

# I.   **INTRODUCTION AND SUMMARY OF ARGUMENT**

The Monex companies seek a temporary restraining order to enjoin defendants' scheme to extort $20 million from Monex.  Monex sells precious metals to investors, and over the past 20 years has had approximately 98,000 customers.  Defendants, two of whom were former customers, operate a website publishing false information about Monex.  They have explicitly told Monex that unless it meets their $20 million demand, they will continue to use their website to defame Monex and to deflect investors away from Monex and toward its competitors.  This past Thursday, March 19, defendants raised their original demand of $15 million to $20 million.  Defendant Richard Gilliam told a Monex manager that, if Monex paid defendants the $20 million, defendants would shut down the website before publication of a major, negative news piece about Monex which defendants shopped to the media and to which they contributed heavily.

Defendants admit that their scheme is successfully costing Monex approximately $1 million in revenue per week, an estimate they base on their communications with Monex customers and potential customers who have viewed their website.  Defendants use their site, www.MonexFRAUD.com, to make false accusations that Monex commits crimes, including a scheme to sell precious metals to customers without delivering these metals to bank depositories, as required by state law and by Monex's agreement with customers.

Defendants' website is the core of their extortion scheme.  They have manipulated web search results so that, when potential customers search Google for the term "Monex," the MonexFRAUD site is listed just below the real Monex site.  Defendants apparently pay for their scheme in part with advertising revenue generated by links from MonexFRAUD to websites operated by Monex's competitors, to whom defendants deflect Monex's customers.

Defendants are not just internet flamers with a personal bone to pick with Monex.  They are con artists using the  Internet to aim their libelous statements at

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

MEMO ISO TRO
Case No. 8:09-CV-00287-JVS-AN

- 1 -

23587\1900827.3

1   destroying Monex's reputation and reducing Monex's revenues for their

2   extortionate purposes. Defendants understand that customers who want to buy

3   precious metals will naturally go to Monex's competitors as customers are

4   unnerved by MonexFRAUD's calibrated allegations of company-wide fraud.

5       Defendants also have misappropriated Monex trade secrets as part of their

6   scheme. They obtained a trade-secret customer list and have refused Monex's

7   demands to return it. Defendants have displayed a page from a Monex customer

8   list on MonexFRAUD, thereby suggesting to website viewers that defendants have

9   the insider's track on Monex.

10      Defendants' scheme is working insofar as it keeps pressure on Monex by

11  continuing to damage its reputation and goodwill and by persuading customers not

12  to do business with Monex. After Monex refused to pay the earlier $15 million

13  demand by defendants' first deadline, defendants carried through on their threats

14  by adding more defamatory material to the website. After Monex filed its

15  complaint, defendants published more defamatory statements.[1]

16      In addition to defendants' admissions that they cost Monex substantial

17  revenues, many Monex customers and potential customers told Monex account

18  representatives that they will not do business with Monex because of what

19  MonexFRAUD says about Monex. Such harm is impossible to measure in dollars

20  because one cannot determine which potential customers never approached Monex

21  due to defendants' scheme. Because the harm cannot be quantified, it can never be

22  remedied. Therefore, unless the Court suspends operation of defendants'

23  extortionate scheme and website, Monex will suffer irreparable harm pending the

24  Court's decision on Monex's request for a preliminary injunction.

25

26  [1] Since Monex filed its Complaint, defendants eliminated, at least temporarily, their
    site's Google advertising links to Monex's competitors. (Declaration of Scott

27  Andrews ¶ 5, Ex. B.) Presumably, defendants understood that such revenue
    generation further exposed the deceit of their criminal enterprise's masquerade as a

28  mere group of Internet citizens invoking First Amendment rights.

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

MEMO ISO TRO                        - 2 -                          23587\1900827.3
Case No. 8:09-CV-00287-JVS-AN

1    Monex expects defendants to argue first that a TRO suspending their website

2    is an unconstitutional prior restraint on speech. But the First Amendment does not

3    protect speech used for extortion, just as it does not protect defendants' fraudulent

4    representations to the public, perjury, or other criminal speech. *E.g., San Antonio*

5    *Cmty. Hosp. v. S. Cal. Dist. Council of Carpenters*, 125 F.3d 1230, 1239 (9th Cir.

6    1997) (affirming preliminary injunction against defamatory and fraudulent speech);

7    see pp. 22–24 collecting cases. Defendants' second expected defense is that

8    defendants' communications with Monex were merely settlement discussions.

9    (Jason Gilliam Answer, Dkt. No. 5.) The explicitness of defendants' threats to

10   harm Monex outside of litigation disproves Gilliam's attempt to sanitize

11   defendants' bald threats as anything other than extortion.

12   Monex therefore asks the Court: (1) to enjoin temporarily defendants'

13   extortionate threats and scheme, (2) to order defendants immediately to remove

14   MonexFRAUD and any of their other anti-Monex sites from the web,[2] (3) to order

15   defendants to return to Monex every document that contains Monex trade secrets,

16   (4) to order defendants to stop using Monex proprietary information in any way,

17   (5) to order defendants to show cause why a preliminary injunction should not

18   issue, and (6) to order early and expedited discovery in preparation for the

19   preliminary injunction hearing.

20

21   [2] To enjoin temporarily only defendants' *further* extortionate threats, without also
     temporarily enjoining their website, will fail to stop defendants' extortion and the
22   resulting irreparable injury to Monex. Without ordering defendants' immediate
     dismantling of the site, defendants will continue to use it to enforce defendants'
23   fresh extortionate threats, by continuing to injure Monex's reputation and to reduce
     its business. For since defendants launched their extortion, all parts of their scheme,
24   most notably their website, have been continuously and irreparably harming Monex
     and will continue to pressure Monex to pay defendants' extortion. Monex knows
25   this, as do defendants. An order temporarily closing down MonexFRAUD is
     therefore essential to halt the harm to Monex, at least until a hearing on Monex's
26   request for a preliminary injunction. There is no question of such a TRO's
     infringement on the First Amendment; once defendants began to use their website
27   to extort, they cancelled any First Amendment protection for their site. See
     authorities collected below at pages 21–24. Monex's requested TRO leaves
28   defendants free to speak with government agencies.

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

MEMO ISO TRO                                    - 3 -                          23587\1900827.3
Case No. 8:09-CV-00287-JVS-AN

II.   **STATEMENT OF FACTS**

    A.   <u>**The Immediate Catalyst For this Application for a TRO**</u>

      The events triggering this TRO application began February 12, when defendant Bowman called Monex President Michael Carabini and set up a meeting at Monex for the next day. (Declaration of Harvey Kochen ¶ 3.) Defendants' website had been in operation some five months. On February 13, defendant Jason Gilliam, the MonexFRAUD "web master," met with Mr. Carabini and Harvey Kochen, the Monex compliance officer. He gave them a letter signed by defendant Bowman. (*Id.* ¶ 5, Ex. A.) The letter contains threats to harm Monex and its principals unless Monex pays defendants $15 million. (*Id.*) Defendants wrote:

> It has taken a period of 6 months to gather evidence, witnesses, and testimony so that we are prepared to bring our business with you to its final conclusion. [The letter then threatens to reveal unspecified information about Monex to CNN, MSNBC, and FOX, causing them to publicize Monex's alleged failings.] . . . I want to bring to your attention Michael that I have substantial evidence and testimony that confirms that Monex is in fact reselling futures. Government agencies are awaiting our cooperation with them to strengthen their cases against you and Monex. There are five former employees, all of which detest Monex, that are willing to testify in open court, a process that only we through MonexFRAUD.com are able to coordinate. [¶] . . . The damage done by MonexFRAUD.com's marketing efforts is nothing short of 10% of your total business, which translates into millions of lost revenues to Monex every week. . . . The result [of defendants' supposed investigation] is the compilation of a devastating case against Monex that will carry great weight across a number of legal venues, which doesn't interest me . . . . However, we *will strongly consider* cooperating with any and all federal agencies actively investigating Monex, and its principals and employees including, but not limited to Louis E. Carabini, Michael Anthony Carabini, Gregory Walker, Michael Maroney, Ron Smoler, Harvey Kochen, Terry Parsons, Dan Wales, Greg Morton, Art Levine, Brandon Kennedy, and R.J. DeVogler.

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

MEMO ISO TRO
Case No. 8:09-CV-00287-JVS-AN
- 4 -
23587\1900827.3

> We will also aid federal agencies in attaching to their investigation individuals at supporting firms such as the branch manager of Farmers & Merchants Long Beach Office . . . . [¶] . . . [¶] *I require $10 million as a partial recovery to distribute amongst the 234 people that were defrauded by Monex, all its subsidiaries, and principals as well as $5 million to fulfill the promises made to me by Terry Parsons, a now terminated employee of Monex.*

(*Id.* [emphasis added].)  Jason Gilliam also told Mr. Carabini and Mr. Kochen during this meeting that he would continue to damage Monex on a daily basis through his website and by drawing government regulators to this information unless Monex met defendants' demands for payment.  (*Id.* ¶ 6 .)

Bowman later claimed to be a lawyer representing Monex customers but he is not.  (Declaration of Neil A. Goteiner ¶ 3.)  Defendants have produced nothing to confirm that they represent those 234 customers, the size of those customers' trading losses, or any connection between those losses and the allegations against Monex.  (*Id.*)  Also contrary to Bowman's representations, he was never a client of Monex, notwithstanding his claim of speaking with a former Monex account representative, Terry Parsons.  (Declaration of Louis E. Carabini ¶ 30.)

Bowman and Jason Gilliam also spoke with Monex counsel on February 13, making similar threats.  (Goteiner Decl. ¶¶ 2–15.)  In an email that evening, Jason Gilliam reinforced the threats yet again by stating, "Since the principals of Monex do not seem too impressed by the information they have received, I would advise you to tell them to just relax and *let the clock run out till Wednesday*[, defendants' deadline to pay them]."  (*Id.* ¶ 16, Ex. C [emphasis added].)

Monex's outside counsel demanded that defendants end their extortionate scheme and offered to provide information disproving defendants' assertions.  (Goteiner Decl. ¶¶ 24–25, 27, Exs. K–L, O.)  Defendants refused to stop, triggering the March 4 filing of the complaint.  After receiving the complaint, defendants not

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

MEMO ISO TRO
Case No. 8:09-CV-00287-JVS-AN

- 5 -

23587\1900827.3

1    only declined to retract their extortion demands but escalated their efforts, costing

2    Monex still more revenue.  (Andrews Decl. ¶ 9, Ex. F.)

3              This past Thursday, defendant Richard Gilliam, Jason Gilliam's father, met

4    with Mr. Kochen at Mr. Gilliam's request.  (Kochen Decl. ¶¶ 9, 13.)  Gilliam told

5    Mr. Kochen that a major news piece describing Monex negatively would be

6    published soon.  (*Id.* ¶ 14.)  Gilliam said that defendants would take down the

7    website prior to the publication if Monex would pay a higher demand, now $20

8    million.  (*Id.* ¶ 16.)  He explained that, if the site were still available after people

9    had read or seen the news publication, they would be able to go to MonexFRAUD

10   and see additional negative claims about Monex there, thus magnifying the harm to

11   Monex that had been caused by the news piece.  (*Id.* ¶ 17.)  He said that, if the

12   website were down already when the news piece went out, the harm would be

13   limited to that caused by the article or broadcast.  (*Id.*)  Gilliam said that he would

14   distribute some of the money to 20 (not 234) customers working with defendants

15   and that defendants would then take a fee and any money left over.  (*Id.* ¶ 18.)

16   Gilliam also said that he has a secret document that the IRS wants and which, he

17   claimed, would help the IRS in a tax case pending against Monex.  (*Id.* ¶ 20.)  He

18   said that if Monex pays the Gilliams $20 million, he would not give the document

19   to the IRS and would give it instead to Monex.  (*Id.*)  Richard Gilliam said his son

20   was "committed to do this his whole life" unless Monex paid the $20 million.  (*Id.*

21   ¶ 21.)  Defendants' continuing extortionate action triggered the instant application

22   for relief.

23             Monex provides additional information on defendants' extortion scheme

24   below but first reviews the factual background so the Court can put the scheme in

25   context.

26   **B.    Monex and the Defendants**

27             Monex Deposit Company ("MDC") deals in precious metals.  (Carabini

28   Decl. ¶ 4.)  Its affiliate, Monex Credit Company ("MCC,") lends money to

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

MEMO ISO TRO                                      - 6 -                                      23587\1900827.3
Case No. 8:09-CV-00287-JVS-AN

1   customers for their purchases of metals from MDC. (*Id.* ¶¶ 5, 7.) Both companies

2   (collectively, "Monex") are in Newport Beach, California. (*Id.* ¶¶ 3, 6.) They have

3   sold gold, silver, and other metals for about twenty years. (*Id.* ¶ 22.) The

4   companies have 208 employees. (*Id.* ¶ 9.) Over the past twenty years, Monex has

5   had approximately 98,000 customers. (*Id.* ¶ 8.)

6          Defendants Jason and Richard Gilliam invested in precious metals with

7   Monex. (*Id.* ¶ 10.) They lost approximately $32,600 in the transactions. (*Id.*

8   ¶ 11.) They asked for a payment of $5,580 from Monex to cover a portion of the

9   losses for which they said Monex was to blame. (*Id.*) Monex offered them half

10  that amount, $2,790. (*Id.*) The Gilliams declined the offer. (*Id.*)

11         Defendant Steven Bowman claims that he was a member of a four-person

12  investment group which lost $5 million trading with Monex. (Goteiner Decl. ¶ 3.)

13  But Monex has no record of ever doing business with Bowman and he has refused

14  to tell Monex who else was in the alleged investment group. (Carabini Decl. ¶ 30;

15  Goteiner Decl. ¶¶ 3, 17, Ex. D.)

16         **C.    The Website's Role In the Extortionate Scheme**

17         In August 2008, defendants, acting through Jason Gilliam, began publishing

18  the defamatory website, www.MonexFRAUD.com. It has been available on the

19  Internet ever since. Defendants' website consistently places just after Monex's

20  entry on a Google search-results page when a user searches for "Monex."

21  (Andrews Decl. ¶ 6, Ex. C.) Jason Gilliam claims to be an "SEO" (search-engine

22  optimizer), *i.e.*, an expert in improving the placement of a website in search results.

23  (*Id.* ¶ 7, Ex. D.)

24         The core alleged facts and narratives on MonexFRAUD remain generally the

25  same, as does the format. Defendants claim that Monex is a "criminal" operating a

26  company-wide "fraud" on several levels. (*Id.* ¶¶ 9, 11 , Exs. F, H.) They falsely

27  assert that Monex and its account representatives misrepresent material facts about

28  investing through Monex. (*Id.*)

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

MEMO ISO TRO
Case No. 8:09-CV-00287-JVS-AN                    - 7 -                    23587\1900827.3

1         They also falsely claim that Monex does not deliver metals to bank

2   depositories for customers' benefit and does not transfer title to customer upon

3   their purchase of precious metals. (*Id.* ¶ 11, Ex. H.) Defendants have no facts to

4   support this fraudulent representation. Louis E. Carabini, President of Comco

5   Management Corp., the general partner of Monex Deposit Company, submitted a

6   declaration that refutes this allegation. (Carabini Decl. ¶¶ 15, 19–24, 26, 29.) This

7   allegation also was the subject of a class action and the creation of a purported

8   class of Monex customers who allegedly had paid storage charges for precious

9   metals that Monex never delivered. (Goteiner Decl. ¶ 21, Ex. H.) The Quinn

10  Emanuel law firm pursued this class action and discovery, which lasted five years.

11  (*Id.*) At the end of the litigation (the settlement's final approval hearing was March

12  16), Quinn Emanuel lawyers admitted under oath that this allegation was untrue

13  and that Monex did, in fact, deliver the precious metals to the banks. (*Id.*)

14  Although Monex sent the Quinn Emanuel lawyer's sworn declaration on this point

15  to defendants, they continue to make this defamatory statement the core allegation

16  in their scheme to scare Monex customers to move to its competitors. (*Id.*)

17        Defendants also allege that the National Futures Association ejected Monex

18  for fraud. (Andrews Decl. ¶ 4, Ex. A.) No such thing happened. (Carabini Decl.

19  ¶ 33.) They assert that the IRS charged Monex with tax evasion. (Andrews Decl. ¶

20  4, Ex. A.) It didn't.[3] They accuse Monex's founder of bribery. (*Id.* ¶ 8, Ex. E.)

21  Again, false. More recently, they exploited the grave illness of a four-year-old

22  child by falsely alleging that Monex is causing his death by having cheated Brad

23  Shields, the boy's father, out of money earmarked for the son's health insurance

24  premiums. (*Id.* ¶ 9, Ex. F.) An interview of the father revealed that, at the time of

25  his investment, his income was $150,000 a year, he owned real estate investments,

---

26  [3] An IRS complaint filed in this court against Monex (but not yet served), does not

27  allege tax evasion. (Andrews Decl. ¶ 13, Ex. I.) It alleges Monex owes the IRS
    money on a default judgment entered 10 years ago against a predecessor company

28  of Monex. (*Id.*)

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

MEMO ISO TRO
Case No. 8:09-CV-00287-JVS-AN                           - 8 -                           23587\1900827.3

1  he understood the risks involved, and he decided to invest despite his son's illness.

2  (Goteiner Decl. ¶ 25.)  After he suffered limited losses, he decided nevertheless to

3  ride out the market in hopes that he would turn a profit.  (*Id.*)  Defendants refused

4  to alter their website story to reflect the truth.  (*Id.* ¶ 25, Ex. L.)

5      Defendants' fraudulent statements described above are only illustrative:

6  defendants' website contains dozens of similarly defamatory allegations.  (A more

7  complete list takes up 55 paragraphs (¶¶ 37–91) of the Complaint.)  As discussed

8  below, Monex gave defendants information that disproves their calumny.  But

9  defendants nevertheless are proceeding with their scheme to use their website to

10  extort money from Monex.

11      **D.    Irreparable Injury Caused By Defendants' Website Scheme**

12      Defendants' false allegations are driving existing Monex customers away

13  from Monex and causing potential investors not to trade with Monex.  Jason

14  Gilliam recently estimated on MonexFRAUD that the site had cost the company at

15  least $2 million in lost revenue over two weeks and, therefore, projected annual

16  damage of $52 million.  (Andrews Decl. ¶ 7, Ex. D.)  As he put it, "It wouldn't

17  shock me to find out that in the last two weeks they'd lost $5,000,000 in

18  business. . . .  But if we go with the minimum it's going to cost them

19  $52,000,000."[4]  (*Id.*)  Jason Gilliam also said that many investors had emailed him,

20  stating that they had been turned off to Monex by MonexFRAUD.  (Goteiner Decl.

21  ¶ 11; Andrews Decl. ¶ 7, Ex. D.)

22  _____

[4] Jason and Richard Gilliam were responsible for their own losses at Monex.  They
23  claim that Monex did not tell them its commissions before they purchased silver.
The standard commission rates, however, are disclosed in the account agreement.
24  (Carabini Decl. ¶ 5, Ex. A.)  In fact, for the Gilliams, Monex reduced the usual
commission rates on most of their transactions.  (Kochen Decl. ¶ 23.)  They claim
25  that Monex mismanaged their trading when, in fact, all customer transactions must
be authorized by the customer; account representatives cannot make trades on their
26  own discretion, as the account agreement states.  (Carabini Decl. ¶ 13.)  The
Gilliams blame Monex for not having sold off their *entire* position when silver lost
27  a certain amount of value.  But, in fact, telephone recordings show that the Gilliams
only placed orders for *part* of their existing silver holdings to be sold at that time.
28  (Kochen Decl. ¶ 24.)

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

MEMO ISO TRO                                    - 9 -                                    23587\1900827.3
Case No. 8:09-CV-00287-JVS-AN

1    Bowman agreed with Jason Gilliam that their website cost Monex substantial

2    revenues and would cost Monex far more unless it caved to defendants' demands.

3    (Goteiner Decl. ¶ 10.)  In addition to Bowman's claim in his initial extortion letter

4    to Michael Carabini that MonexFRAUD had cut Monex's revenue by 10 percent

5    (Kochen Decl. ¶ 5, Ex. A), Bowman also said that he was on 30 to 40 telephone

6    calls during which potential Monex customers said they wouldn't invest in Monex

7    after having read MonexFRAUD.  (Goteiner Decl. ¶ 10.)

8    Dozens of customers and potential customers have told Monex account

9    representatives that they won't do business with Monex because MonexFRAUD

10   persuaded them to go elsewhere with their money.  We submit the declarations of

11   just two of Monex's 113 account representatives, Sid Hukic and Joe Vincent,

12   summarizing their calls with customers who said MonexFRAUD had caused them

13   to stop doing business with Monex.  (*See, generally,* Declarations of Joe Vincent

14   and Sid Hukic; Carabini Dec. ¶ 9.)[5]  Customers have posted messages in

15   MonexFRAUD's "forum" section, stating that the website caused them not to

16   purchase from Monex.  (Andrews Decl. ¶ 7, Ex. D.)  For example,

17   "Bullionnewbie" wrote, "They lost my business as a result of this site.  I'm sure

18   they've lost others as well."  (*Id.*)

19   Another indication of MonexFRAUD's influence is its substantial traffic.

20   As of March 20, the site shows that it had received 47,163 "unique visitors."  (*Id.,*

---

21   [5] These declarations have not identified the customers' names out of privacy
22   concerns. Monex does not expect defendants to object because they have disclosed
     their success in scaring away Monex customers.  If, however, the Court or
23   defendants want more detail on these customers, Monex will disclose customer
     names and additional information subject to a protective order.

24   The Court can consider for this TRO application, for the truth of the matter
25   asserted, the account representatives' summary of customers' statements.  *See*
     *Flynt Distrib. Co. v. Harvey,* 734 F.2d 1389, 1394 (9th Cir. 1984) ("The trial court
26   may give even inadmissible evidence some weight [in considering whether to grant
     a preliminary injunction] when to do so serves the purpose of preventing
27   irreparable harm before trial."); *RD Legal Funding, LLC v. Erwin & Balingit,*
     *LLP,* Civil No. 08cv597-L(RBB), 2008 WL 3843511, *1 (S.D. Cal. 2008) (TRO
28   proceeding).

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

MEMO ISO TRO                                    - 10 -                              23587\1900827.3
Case No. 8:09-CV-00287-JVS-AN

¶ 9, Ex. F.)  Jason Gilliam claims on the site that people from 49 U.S. states and 47 nations have visited it.  (*Id.* ¶ 7, Ex. D.)

For every person who tells Monex that the website drove him or her away, there are undoubtedly many more who are reacting identically but not telling Monex.  There are probably still more who never contact Monex in the first place because of MonexFRAUD's defamatory content.  The company therefore has no way of knowing how many people MonexFRAUD has scared off.  The harm inflicted on Monex, although significant, is thus impossible to measure precisely.

### E.    Additional Facts About Defendants' Extortion

Defendants refuse to provide information to legitimize their demands.  (Goteiner Decl. ¶¶ 3, 7, 15, 17–18, 20, Ex. G.)  They refuse to say who are the 234 (or 20) people they represent.  (*Id.* ¶¶ 3, 7, 15, 18.)  Bowman will not provide a physical or mailing address.  He declines to say through whom he invested at Monex.  (*Id.* ¶ 17.)  He claims to be a lawyer but there is no record of him on the licensing rolls for Canada, where he lives, or California.  (Andrews Decl. ¶ 12 [concerning license in California].)  The president of Bowman's recent employer accused him this month of stealing a computer.  (Goteiner Decl. ¶ 28, Ex. P.)

On February 13, Bowman and Jason Gilliam spoke with Monex's counsel and reiterated their threats and their then original demand for $15 million.  (*Id.* ¶¶ 2–15.)  Bowman admitted that those demands sounded like extortion.  (*Id.* ¶ 9.)  Also in that call, Gilliam emphasized again the leverage he had over Monex by claiming credit for an increase in the number of complaints about Monex to the Better Business Bureau, from less than 20 (out of 98,000 customers) to 59.  (*Id.* ¶ 12.)

Later on February 13, Jason Gilliam sent his email giving Monex until the following Wednesday to comply with defendants' demands.  (*Id.* ¶ 16, Ex. C.)  In addition, Gilliam sent to Monex's counsel defendants' "Plan of Action Outline," which also had been provided with the original letter demanding $15 million.  (*Id.*

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

MEMO ISO TRO
Case No. 8:09-CV-00287-JVS-AN                    - 11 -                    23587\1900827.3

1    ¶¶ 2, 15, Exs. A–B.)  The "Plan of Action Outline" threatens to use MonexFRAUD

2    to "damage Monex marketing efforts," to continue "to spread awareness of the

3    Monex scam to the public," and to build lawsuits against Monex.  (*Id.*)  In the same

4    email, Mr. Gilliam threatened to provide information about Monex to the IRS, the

5    SEC, the NFA, the CFTC, the FTC, the FCC, the U.S. Justice Department, the FBI,

6    and the news media.  (*Id.* ¶ 15, Ex. B.)  In the same email, Gilliam threatened to

7    sue Monex for more than $1 billion.  (*Id.* ¶ 15, Ex. B.)

8        On February 17, Monex's counsel emailed defendants, explicitly confirming

9    that their threats constituted extortion and refusing to pay.  (*Id.* ¶ 18, Ex. E.)[6]

10   Defendants were therefore well aware that Monex viewed their demands as illegal.

11   Monex's counsel also stated in that email that defendants had their facts wrong in

12   alleging that Monex does not deliver customers' precious metals to bank

13   depositories and does not pass title to its customers upon purchase of metals.  (*Id.*)

14   In addition to warning defendants to conduct due diligence before defaming Monex

15   further, the company's counsel also offered to give defendants additional facts if

16   they would share any information supporting their contentions about Monex.  (*Id.*)

17       On the afternoon of February 18, Monex's counsel again addressed

18   defendants' claim that Monex was selling precious metals but failing both to

19   deliver them to independent depositories and to pass title to the customers.  (*Id.* ¶

20   21, Ex. H.)  Monex's attorneys emailed defendants, providing details of a five-year

21   class action against Monex in Orange County Superior Court, including copies of

22   the pleadings.  (*Id.*)  In that dispute, Quinn Emanuel Urquhart Oliver & Hedges

---

[6] Jason Gilliam responded to this email in the evening of February 17, claiming that Monex's interpretation of defendants' letter from Bowman was "flawed and inaccurate."  (Goteiner Decl. ¶ 19, Ex. F.)  He claimed that the letter did not contain any threat or any offer to shut down the website if Monex would pay the $15 million.  (*Id.*)  Gilliam, however, did not address the actual language of Bowman's letter, or Gilliam's own February 13 email giving the deadline for payment, or Bowman's refusal to state whom he represents until he heard directly from Monex's principals that they were ready to "deal."  (*See id.* ¶¶ 2, 16, 20, Exs. A, C, G.).  Richard Gilliam's Thursday extortion demand further trumps Jason's extortion denial.  (*See* Kochen Decl. ¶¶ 13–22.)

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

MEMO ISO TRO                                    - 12 -                              23587\1900827.3
Case No. 8:09-CV-00287-JVS-AN

1    LLP, on behalf of a class of customers, asserted that Monex was making just the

2    sort of misrepresentations that MonexFRAUD was alleging. (*Id.*) Many of those

3    claims were dropped. (*Id.*) At the time of the extortion demands, Quinn

4    Emanuel's clients and Monex were settling that case, which originally covered

5    approximately 100,000 Monex customers, for a fraction of nuisance value. (*Id.*)

6    (The payment to class members that was ultimately approved was only about

7    $35,000 for a class of 92 customers allegedly charged excessive lease fees.

8    [Andrews Decl. ¶ 10, Ex. G.]) As part of that process, Quinn Emanuel had agreed

9    to decertification of a subclass purportedly consisting of customers misled by

10    Monex about bank depository storage charges. (Goteiner Decl. ¶ 21, Ex. H.)

11    Quinn based the subclass on the same allegations now leveled by MonexFRAUD:

12    that Monex failed to deliver customers' metals to depositories. (*Id.*) Quinn

13    conceded in this decertification agreement that there were no members in the

14    subclass and therefore that no one was ever misled by Monex's true statement that

15    the metals were delivered to the depositories and held for the benefit of the

16    purchasers. (*Id.*) The declaration of a Quinn Emanuel lawyer, which Monex gave

17    to defendants, swore that HSBC, one of Monex's depository banks, stored

18    substantial amounts of precious metals for Monex customers. (*Id.*) As Monex's

19    counsel noted to defendants, Quinn Emanuel had substantial motivation, as a class

20    fiduciary and for its own fees, to pursue the allegations aggressively and to recover

21    larger amounts for the class. (*Id.*) The Gilliams and Bowman nevertheless

22    threatened to sue HSBC, one of the Monex depository banks, and told Monex

23    about the threat. (*Id.* ¶ 15, Ex. B.) Defendants declined to address these facts

24    about the depositories in the ensuring email exchange. (*Id.* ¶ 23, Ex. J.)

25         On February 19, Bowman again refused to identify through whom he

26    supposedly had invested in Monex. (*Id.* ¶ 20, Ex. G.) He stated, "[W]e will reveal

27    ourselves only to the principles [sic] of Monex when we feel and are convinced

28    they are prepared to deal." (*Id.*) Bowman threatened that defendants "will

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

MEMO ISO TRO
Case No. 8:09-CV-00287-JVS-AN                    - 13 -                    23587\1900827.3

1    continue to damage the credibility of Monex every day until they reimburse the

2    money they stole from us." (*Id.*)

3         Later on February 19, Bowman sent another message to Monex's counsel

4    implying that, unless defendants were paid, they would give evidence to the IRS

5    that would be useful against Monex in the tax dispute pending before the Court.

6    (*Id.*)  The email claimed that the evidence was a "silver bullet" for the IRS and that

7    the "IRS is currently unaware of this document's existence. . . .  If you are

8    interested in speaking to me on behalf of Monex . . . I am ready and willing." (*Id.*)

9         Also in that email, Bowman said that he had Monex proprietary information,

10   particularly a Monex customer list for a former Monex broker. (*Id.*)  Monex

11   demanded the return of the trade secret customer list. (*Id.* ¶ 26, Exs. M, N.)  The

12   list has not been returned and defendants, by never responding, apparently have

13   refused to do so. (*Id.* ¶ 26.)

14        In response, Monex explained what was incorrect about defendants' most

15   serious accusations and offered to provide documentation to back up its positions.

16   (*E.g.*, *id.* ¶ 25, Ex. L.)  It asked for defendants to take down MonexFRAUD, due to

17   its use to extort money from Monex, and to stop their threats to go to the regulatory

18   authorities. (*Id.* ¶¶ 24–25, Exs. K–L.)  Defendants never did.

19        When Monex did not pay the extortion demand of $15 million by

20   February 18, defendants began to carry through on their threats, as they had

21   promised.  On February 21, MonexFRAUD published the false allegation that

22   Monex was causing the death of the four-year-old boy by duping his father, Brad

23   Shields. (Andrews Decl. ¶ 9, Ex. F.)  Monex's counsel responded the same day by

24   demanding that defendants close the website and end the rest of the extortionate

25   scheme. (Goteiner Decl. ¶ 24, Ex. K.)  In the same email, counsel described how

26

27

28

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

MEMO ISO TRO
Case No. 8:09-CV-00287-JVS-AN                          - 14 -                          23587\1900827.3

1  35 of defendants' statements were defamatory. (*Id.*)  Defendants gave no reason

2  why they believed the defamatory statements to be true.[7]

3  Defendants also carried out their threats by posting to the website a

4  misleadingly truncated recording of a Monex account representative. (Andrews

5  Decl. ¶ 14, Ex. J.)  The truncation made it seem that the representative was

6  providing false information about the profitability of his customers' accounts.  The

7  recording was made surreptitiously, in violation of anti-wiretap laws. *See* Cal.

8  Penal Code § 631, 18 U.S.C. § 2511.  When Monex's counsel pointed out the false

9  innuendo and defamatory content of the posting, defendants did nothing to correct

10  it. (Goteiner Decl. ¶ 27. Ex. O.)[8]

11  Finally, Jason Gilliam carried out his threat to go to the IRS.  He contacted

12  the assistant U.S. attorney representing the IRS in its dispute with Monex. (*Id.* ¶

13  29, Ex. Q.)  Gilliam described to the AUSA the defendants' "silver bullet"

14  evidence against Monex. (*Id.*)  The IRS asked to see the document but, apparently

15  to maintain their leverage, defendants refused and now say that they will not give it

16  to the IRS at all if Monex pays the $20 million. (*Id.*; Kochen Decl. ¶ 20.)

17  On March 4, Monex filed a complaint against defendants in the Superior

18  Court of California for Orange County.  Jason and Richard Gilliam were served.  A

19  copy of the complaint and summons is being served on Mr. Bowman through

20  Canadian authorities. (*See, generally*, Affidavit of Nao Sakamoto.)  On March 9,

21  Jason Gilliam filed a notice of removal to this court.

---

[7] After Monex's counsel interviewed Brad Shields, the undersigned sent a February 23 email to defendants summarizing the interview, stating why defendants' report on the story was defamatory, and demanding that defendants shut down the site, or at least purge it of all defamatory material. (Goteiner Decl. ¶ 25, Ex. L.)

[8] Defendants also tried to intimidate Monex and its counsel further by printing part of a Forbes magazine article about Monex's undersigned counsel, without referring to Forbes' subsequent clarification, or to readily available Supreme Court pleadings. (Andrews Decl. ¶ 9, Ex. F [defendants' publication]; Goteiner Decl. ¶ 27 [summarizing facts surrounding Forbes article and referring to the subsequent Forbes piece].)

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

MEMO ISO TRO
Case No. 8:09-CV-00287-JVS-AN
- 15 -
23587\1900827.3

III.   **ARGUMENT**

A TRO is necessary to stop the irreparable harm to Monex by requiring defendants to cease their extortion, including shutting down MonexFRAUD, stopping their threats to speak to government regulators (we have no problem with defendants actually speaking to the regulators), and ceasing using Monex trade-secret customer lists for any purposes, including any attempts to contact Monex customers.  Courts have held that, in unusual circumstances such as those here, injunctions against such speech are appropriate.  See pages 21–24, below.

A.   **Defendants' Conduct and Surrounding Facts Meet TRO Criteria for Enjoining Defendants' Website Pending the Preliminary Injunction Hearing**

Courts grant TROs when: 1) the moving parties are likely to be harmed immediately in ways that cannot be redressed by a post-trial remedy, 2) the parties seeking the TRO have a reasonable probability of success in the action, 3) the balance of equities tips in the plaintiffs' favor, and 4) the TRO is in the public interest.  *Winter v. Natural Res. Def. Council, Inc.*, 129 S. Ct. 365, 374, 172 L. Ed. 2d 249, 260 (2008).  All those factors are present here.

1.   **Monex Is Suffering Irreparable Harm Because Damage to Its Reputation and Goodwill From Defendants' Extortion Cannot Be Calculated or Remedied.**

Defendants' extortion scheme is causing Monex paradigmatically irreparable and imminent harm — defendants operate the scheme continuously, and have increased both their pressure and the amount they are demanding.  Richard Gilliam's demands last week to Mr. Kochen drive home the point:  until Monex pays defendants $20 million — or the Court intervenes — they will continue to use their website to hurt Monex's reputation and goodwill and to drive away an undeterminable number of customers. [9]

---

[9] *See Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 18 (1st Cir. 1996) (holding that harm is irreparable if it is not accurately measurable); *accord FoodComm Int'l v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003).  Situations in which harm is not measurable and therefore irreparable include:  (1) harm causing "substantial loss of business," including loss of current or future market share,

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

MEMO ISO TRO
Case No. 8:09-CV-00287-JVS-AN

- 16 -

23587\1900827.3

1   A large percentage of Monex's customers almost certainly changed their

2   minds about the company because of what they read on defendants' website. This

3   conclusion is supported by defendants' admissions that they are driving away

4   Monex's customers and the Monex account representatives' declarations that

5   MonexFRAUD is scaring away customers and potential customers.

6   Of course, most potential customers whom defendants have soured on

7   Monex do not inform Monex why they will not do business with Monex. And so

8   Monex has no way to know how many of them are turned off because of

9   MonexFRAUD. Even if we could know who those people are, it would be

10  impossible to determine how much business they would have done with Monex.

11  Defendants' use of the Internet for this sort of factual allegation is of a

12  singularly powerful medium for harming Monex, given how investors increasingly

13  choose it over traditional media and use it interactively. Whenever a Monex

14  customer or potential customer looks up "Monex," he or she sees MonexFRAUD

15  on the same Google page. Furthermore, web-based defamation, unlike that in

16  newspapers or on television, does not subside without active intervention. It is

17  relentless and, therefore, a powerful extortion tool for defendants.

18   **2.   Monex Has a Reasonable Probability of Succeeding On the Merits Because Its Claims Are Viable And Rest On Solid**
19   **Evidence.**

20  Monex has a reasonable probability of prevailing on each of its claims. The

21  merits of Monex's extortion claim are particularly relevant to Monex's application

22  for temporary suspension of defendants' website. While the balance of hardships

23  *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975); *Grand River Enter. Six*
24  *Nations, Ltd. v. Pryor*, 481 F.3d 60, 67 (2nd Cir. 2007); (2) loss of prospective
    customers, *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d
25  832, 841 (9th Cir. 2001); (3) loss of goodwill, *id.*; *Rent-A-Center, Inc. v. Canyon*
    *Television & Appliance*, 944 F.2d 597, 603 (9th Cir. 1991); and (4) loss of
26  reputation, *Cassim v. Bowen*, 824 F.2d 791, 795 (9th Cir. 1987). Courts can grant
    TROs when the irreparable harm to the plaintiffs is both imminent and likely.
27  *Winter*, 129 S. Ct. at 374 (likelihood); *Midgett v. Tri-County Metro. Transp. Dist.*
    *of Or.*, 254 F.3d 846, 850–51 (9th Cir. 2001) (imminent); *Caribbean Marine Srvcs.*
28  *Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (imminent).

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

MEMO ISO TRO                    - 17 -                         23587\1900827.3
Case No. 8:09-CV-00287-JVS-AN

1    tips sharply in the movants' favor, as described below, Monex need only show that

2    "there is a fair chance of success on the merits" of the extortion claim. *Johnson v.*

3    *Cal. State Bd. of Accountancy*, 72 F.3d 1427, 1430 (9th Cir. 1995). Here, there is

4    exponentially more than a fair chance of success.

5           **a.    The Extortion and Conversion Claims Are More**

6           **         Than Reasonably Probable to Succeed.**

7           The elements of attempted civil extortion in California are 1) an attempt to

8    obtain of property 2) from another, 3) with his consent, 4) induced by a wrongful

9    use of force or fear, or under color of official right. *See* Cal. Pen. Code § 518 (civil

10   elements derived from Penal Code).[10] The elements of attempted conversion are

11   1) an attempt to exercise control 2) wrongfully 3) over the personal property of

12   another. *Farmers Ins. Exch. v. Zerin*, 53 Cal. App. 4th 445, 451, 61 Cal. Rptr. 2d

13   707, 709 (1997).

14          Here, defendants' own correspondence demonstrates that there is a

15   reasonable probability that Monex can prove all elements of attempted civil

16   extortion and conversion. Defendants attempted to force Monex involuntarily to

17   pay them $20 million. They still are doing so by threatening Monex and carrying

18   through on their threats. The communications between defendants and Monex

19   demonstrate beyond cavil that defendants attempted to extort money from Monex.

20   It does not matter if material on defendants' web site is true or false; threats to

21   reveal either true or false negative information, absent a payment, constitute

22   extortion. *See People v. Choynski*, 95 Cal. 640, 642, 30 P. 791, 791 (1892)

23   (holding that the truth of falsity of the information threatened to be disclosed is

24   irrelevant to whether or not extortion was committed). That so much of the

25

26

27   ───────────────────
     [10] Civil extortion claims have been recognized in *Flatley v. Mauro*, 39 Cal. 4th 299,
     305, 139 P.3d 2, 5 (2006) and *Family Planning Specialists Med. Grp., Inc. v.*

28   *Powers*, 39 Cal. App. 4th 1561, 1565, 46 Cal. Rptr. 2d 667, 669 (1995).

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

MEMO ISO TRO                                    - 18 -                          23587\1900827.3
Case No. 8:09-CV-00287-JVS-AN

1    information is demonstrably false and is influencing customers only underlines the

2    irreparable injury and necessity of the TRO.[11]

3         Defendants' extortion scheme ends defendants' anticipated claims that a

4    TRO amounts to an unconstitutional prior restraint on speech, as discussed at pages

5    21–24.  This application is far more than an effort to stop defendants' defamation

6    and other torts, which would, absent the extortion scheme, come under closer

7    scrutiny.  Instead, the central issue here is extortion; the other torts are merely

8    conduits through which defendants carry out their threats to harm Monex if Monex

9    refuses to pay.  The requested TRO to shut down defendants' main extortion tool is

10   therefore proper and required to effectively enjoin the extortion scheme.

11
         **b.      The Attempted Defamation and Trade Libel Claims
12                  Are Reasonably Probable to Succeed.**

13        Defendants' statements meet the California elements of defamation:  1)

14   publications that are 2) false and 3) defamatory, and that 4) have a natural tendency

15   to injure or that cause special damage.  Cal. Civ. Code §§ 45–46.  The statements

16   also constitute trade libel, which is any 1) false 2) disparagement of 3) the quality

17   of goods or services.  *Leonardini v. Shell Oil Co.*, 216 Cal. App. 3d 547, 572, 264

18   Cal. Rptr. 883, 896 (1989).  The major difference between the two torts is that

19   defamation attacks a business's reputation while trade libel directly attacks the

20   quality of the goods and services it sells.  Here, there is a reasonable probability

21   that Monex can prove all elements of defamation and trade libel.  It is enough that

22   defendants have falsely asserted on their website, with references to letters and

23   other documents, that Monex does not deliver metals to bank depositories for the

24   benefit of Monex customers who purchased the metals, and also fails to deliver title

25   to them.  These false "facts" about a core Monex scheme and fraud subject it to

---

[11] The attempted conversion claim is reasonably probable to succeed because
conversion is available to seek the return of money, not just the more typical forms
of personal property. *See Haigler v. Donnelly*, 18 Cal.2d 674, 681, 117 P.2d 331,
335 (1941).

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

MEMO ISO TRO
Case No. 8:09-CV-00287-JVS-AN                              - 19 -                    23587\1900827.3

contempt, ridicule, and hatred in the eyes of the investing public. Those statements also falsely disparage the quality of the goods and services offered by Monex, especially given that their quality depends heavily on the company's integrity.

### c. The Misappropriation of Trade Secrets Claim Is Reasonably Probable to Succeed.

The elements of the types of trade-secret misappropriation that are relevant here are either 1) acquisition of 2) another's trade secret 3) by a person 4) who had reason to know that the secret was acquired by improper means or, alternatively, 1) use 2) of a another's trade secret 3) without consent 4) by a person 5) who used improper means to acquire the secret or 6) knew the secret came from someone who had obtained it improperly or who had a duty not to disclose it. Cal. Civ. Code §§ 3426.1–3426.3.

Here, there is a reasonable probability that Monex can prove misappropriation. On February 23, defendants conceded that they had customer information that was Monex's property. That information, detailing the customers' interactions with Monex, is valuable partly because it is kept secret from Monex's competitors. Such information likely reached defendants from one of Monex's former or current employees — the only people with access to the information normally — who are under duties not to reveal that information.

### d. All Remaining Claims Are Reasonably Likely to Succeed.

Two means of defendants' extortion were to disrupt Monex's relationships with customers and potential customers. Defendants bragged about their success in committing this tort, publicizing the losses they had inflicted on Monex. These admissions demonstrate that Monex probably will succeed in its intentional and negligent interference claims, as well as its intentional interference with contractual relations. Defendants' conduct was wrongful because it involved extortion, defamation, trade libel, and other torts.

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

MEMO ISO TRO
Case No. 8:09-CV-00287-JVS-AN

- 20 -

23587\1900827.3

1   Monex also likely will succeed in its civil RICO claim given that the

2   extorting defendants probably derived income from the advertising links, used the

3   website to operate the pattern of racketeering activity, and participated in the

4   enterprise's activities. *See* 18 U.S.C. § 1961(1).

5   Similarly, Monex is reasonably likely to succeed on its cyberpiracy claim

6   given defendants' bad faith intent to use Monex's mark in their website in order to

7   1) capture ad revenue generated by click-through traffic to Monex's competitors

8   and 2) solicit contributions from people who mistakenly went to MonexFRAUD

9   while trying to go to the true Monex website.

10   All of these activities also establish defendants' unfair business practices, as

11   alleged in plaintiffs' ninth cause of action. Defendants are profiting from their

12   unlawful activities by increasing their ad revenues through use of fraudulent and

13   defamatory statements about Monex to drive customers to Monex's competitors.

14   Defendants also are apparently profiting by seeking contributions from their

15   website viewers.

16   **3.    The Balance of Equities Tips in Monex's Favor Because The**
17   **Harm to Its Business Is Great and Defendants Will Suffer**
     **No Legally Cognizable Harm by a TRO.**

18   The balance of equities tips deeply in Monex's favor. Defendants'

19   extortionate scheme is harming Monex daily as defendants admit, in an

20   unknowable magnitude. (*See, generally,* Hukic Decl., Vincent Decl.) Enjoining

21   defendants' extortionate scheme pending the outcome of the preliminary injunction

22   hearing will cause defendants no harm to any protected interest, First Amendment

23   or otherwise.[12]

24

25   [12] The Fifth Circuit held that a court need not balance the hardships when the
     defendants' conduct was willful. *United States v. Marine Shale Processors,* 81
26   F.3d 1329, 1359 (5th Cir. 1996). Here, defendants' extortion, defamation,
     attempted conversion, trade libel, intentional interference with prospective
27   economic advantage, intentional interference with contractual relations, RICO
     violations, and cyberpiracy were all intentional. The Court therefore may dispense
28   entirely with balancing the hardships.

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

MEMO ISO TRO
Case No. 8:09-CV-00287-JVS-AN                    - 21 -                    23587\1900827.3

1   A person has no free-speech right to engage in speech that is illegal. *Flatley*

2   *v. Mauro*, 39 Cal. 4th 299, 320, 46 Cal. Rptr. 3d 606, 621–22 (2006) (holding that

3   there are no anti-SLAPP protections for unlawful speech); *Aguilar v. Avis Rent A*

4   *Car Sys., Inc.*, 21 Cal. 4th 121, 133–45, 87 Cal. Rptr. 2d 132, 141–50 (1999)

5   (holding that unlawful discriminatory speech can be enjoined) (plurality opinion);

6   *Sterling Trading, LLC v. United States*, 553 F. Supp. 2d 1152, 1162 (C.D. Cal.

7   2008) ("Where the IRS has demonstrated, as it has here, that there is reason to

8   suspect that the purportedly protected speech was made in the context of promoting

9   an abusive tax scheme, that speech is no longer protected by the First

10   Amendment.") (internal quotation marks omitted). *Flatley* held that California's

11   anti-SLAPP protections are unavailable to extortionate speech because such speech

12   is unlawful and therefore beyond First Amendment protection. 39 Cal. 4th at 320.

13   Restrictions on unlawful speech are therefore perfectly consistent with the First

14   Amendment and the California constitution's free speech guarantee.[13]

15   Courts therefore can and do enjoin extortionate speech with TROs. *E.g.*,

16   *Family Planning Specialists Med. Grp., Inc. v. Powers*, 39 Cal. App. 4th 1561,

17   1565, 46 Cal. Rptr. 2d 667, 669 (1995) (enjoining distribution of flyer that was part

18   of alleged extortion scheme); *Burnham Broad. Co. v. Williams*, 629 So.2d 1335,

19   1341 (La. Ct. App. 1993) (holding that preliminary injunction against threats was

20   proper because lower court had found that plaintiffs had made out a prima facie

---

[13] The U.S. Supreme Court also has so held. *E.g.*, *Pittsburgh Press Co. v. Human Rel. Comm'n*, 413 U.S. 376, 391, 93 S. Ct. 2553, 2561–62 (1973) (holding that order forbidding newspaper from publishing unlawful "help wanted" advertisements in gender-designated columns was not a prohibited prior restraint); *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 55, 93 S. Ct. 2628, 2634 (1973) (upholding statute authorizing injunction against exhibition of obscene materials because statute imposed no restraint on exhibition until after finding that the film was obscene and therefore not constitutionally protected); *Kingsley Books, Inc. v. Brown*, 354 U.S. 436, 445, 77 S. Ct. 1325, 1330 (1957) (upholding law allowing injunctions against speech adjudicated to be obscene); *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 438–39, 31 S. Ct. 492, 497 (1911) (holding that unlawful speech in boycott can be enjoined); *see also Near v. Minn.*, 283 U.S. 697, 715, 51 S. Ct. 625, 630 (1931) ("[T]he common law rules that subject the libeler to responsibility . . . are not abolished by the protection extended in our Constitutions.").

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

MEMO ISO TRO
Case No. 8:09-CV-00287-JVS-AN                    - 22 -                    23587\1900827.3

case of extortion against defendants). Pennsylvania's intermediate appellate court held that speech that shut down a shopping center in order to pressure the center pay "reparations" constituted extortion and therefore was properly subject to a preliminary injunction. *Rouse Phila. Inc. v. Ad Hoc '78*, 417 A.2d 1248, 1256, 274 Pa. Super. 54, 68–69 (Pa. Super. Ct. 1979); *see also Burnham Broad. Co.*, 629 So. 2d at 1341.

The Ninth Circuit has also upheld a preliminary injunction against the type of defamatory speech present here — even without any allegation of other torts that might justify the relief.  In *San Antonio Community Hospital v. Southern California District Council of Carpenters*, the court held that the First Amendment did not bar a preliminary injunction against a union displaying a sign stating: "THIS MEDICAL FACILITY IS FULL OF RATS." 125 F.3d 1230, 1239 (9th Cir. 1997).  The court held that the statement was false (or as the court put it, a "fraudulent misrepresentation[] of fact"), hurt the hospital's reputation, and caused harm that was irreparable because it could not be measured. *Id.* at 1237–38 (the court stated that "it is impossible to measure the number of potential patients who were deterred from seeking medical care at the Hospital").[14]

Defendants' advertising links and their associated monetary gain make it relevant here to consider cases in which preliminary injunctions issued against false commercial speech by one competitor against another, *see, e.g., J.K. Harris & Co. v. Kassel*, 253 F. Supp. 2d 1120, 1131 (N.D. Cal. 2003), against speech that unlawfully harms a person's property interests, as by libeling goods or services or by defaming a company's officers, *Montgomery Ward & Co. v. United Retail*,

---

[14] Other jurisdictions also have preliminarily enjoined defamation. *See Vondran v. McLinn*, No. C 95-20296 RPA, 1995 WL 415153, at *4, *6 (N.D. Cal. July 5, 1995) (defamatory statements not protected from injunction by First Amendment, particularly when adequate procedural protections are in place against erroneous issuance of injunction); *Martin v. Reynolds Metals Co.*, 224 F. Supp. 978, 983–85 (D. Or. 1963); *Cochran v. Tory*, No. B159437, 2003 WL 22451378, at *2 (Cal. Ct. App. 2003) (noting preliminary injunction by trial court) (unpublished); *Bingham v. Struve*, 591 N.Y.S.2d 156, 159 (N.Y. App. Div. 1992).

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

MEMO ISO TRO                                                - 23 -                                    23587\1900827.3
Case No. 8:09-CV-00287-JVS-AN

1  *Wholesale & Dep't Store Employees of Am., CIO,* 79 N.E. 2d 46, 51, 400 Ill. 38, 47

2  (Ill. 1948), and speech that reveals a trade secret, *DVD Copy Control Ass'n, Inc. v.*

3  *Bunner,* 31 Cal. 4th 864, 886, 4 Cal. Rptr. 3d 69, 88 (2003).

4       Also, a speech injunction that is content neutral, as with extortion,[15] is proper

5  when it affects "no more speech than necessary to serve a significant government

6  interest." *Madsen v. Women's Health Ctr., Inc.,* 512 U.S 753, 765, 114 S. Ct.

7  2516, 2525 (1994); *Schenck v. Pro–Choice Network of W. N.Y.,* 519 U.S 357, 372–

8  74, 117 S. Ct. 855, 864–65 (1997). The Ninth Circuit has rejected First

9  Amendment attacks on injunctions in trademark-related cases such as this one.

10  *Dr. Seuss Enters., L.P. v. Penguin Books U.S.A., Inc.,* 109 F.3d 1394, 1403,

11  n.11 (9th Cir. 1997) (citing *Dallas Cowboys Cheerleaders, Inc. v. Pussycat*

12  *Cinema, Ltd.,* 604 F.2d 200, 206 (2d Cir. 1979)).

13       Finally, the adversarial nature of a TRO proceeding done with notice to

14  defendants protects the resulting injunction against charges that it violates free-

15  speech rights.[16] Here, defendants have an opportunity to present their arguments

16  and evidence to the Court and the burden of proof remains with Monex. There are

17  thus sufficient procedural safeguards under *Carroll v. President and*

18  *Commissioners of Princess Anne* and *Freedman v. State of Maryland* (see n. 16).

19  For all these reasons, the TRO can be entered without affecting any lawful speech

20  protected by the First Amendment.

21  [15] A "content neutral" restriction is any restriction that is justified based on
something *other* than the viewpoint expressed by the speaker. Rodney A. Smolla,
22  1 Smolla and Nimmer on Freedom of Speech § 3:3 (2008). An injunction on
extortionate speech is content neutral because it is justified by reference to the
23  effect and intent of the speech, not the viewpoints expressed by the extortionist.

24  [16] A noncriminal process of prior restraints upon speech can avoid "constitutional
infirmity" if has "procedural safeguards designed to obviate the dangers of a
25  censorship system," including putting the burden of proof on the party seeking the
injunction and requiring a hearing at which both sides can present their cases.
26  *Freedman v. State of Md.,* 380 U.S. 51, 58–59, 85 S. Ct. 734, 738–39 (1965); *see
also Carroll v. President & Comm'rs of Princess Anne,* 393 U.S. 175, 181, 89
27  S. Ct. 347, 351 (1968) ("[When injunctions against speech are allowed the] Court
has insisted upon careful procedural provisions, designed to assure the fullest
28  presentation and consideration of the matter which the circumstances permit.").

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

MEMO ISO TRO
Case No. 8:09-CV-00287-JVS-AN

- 24 -

23587\1900827.3

**B.   The Court Should Allow Early Discovery To Gather Evidence For A Preliminary Injunction Hearing**

The requested preliminary injunction creates good cause to allow the parties expedited document and deposition discovery upon two days or greater notice, especially when as here there no prejudice results. *See, e.g., In re Countrywide Fin. Corp. Derivative Litig.*, 542 F. Supp. 2d 1160, 1179 (C.D. Cal. 2008); *Qwest Comms. Int'l, Inc. v. WorldQuest Networks, Inc.*, 213 F.R.D. 418, 419 (D. Colo. 2003); *see also Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1326 (9th Cir. 1994) (citing with approval secondary source stating that good cause includes preliminary-injunction proceedings).  Good cause also exists where there are claims of unfair competition. *Qwest Comms. Int'l, Inc.*, 213 F.R.D. at 419.  Here, evidence is required on a number of issues, including the MonexFRAUD viewers' response to MonexFRAUD, the basis for defendants' allegations, defendants' revenues from MonexFRAUD, and defendants information on Monex's losses.

## IV.   CONCLUSION

For the reasons stated, Monex asks the Court to enter the proposed temporary restraining order, proposed order to show cause, and proposed order allowing early discovery.

Dated:  March 22, 2009                    FARELLA BRAUN & MARTEL LLP


                                          By: /s/ Neil A. Goteiner
                                               Neil A. Goteiner

                                          Attorneys for Plaintiffs
                                          MONEX DEPOSIT COMPANY and
                                          MONEX CREDIT COMPANY

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

MEMO ISO TRO
Case No. 8:09-CV-00287-JVS-AN

- 25 -

23587\1900827.3